Cary A. EVERETT, Plaintiff,

v.

The CITY OF TALLAHASSEE,
a Municipal Corporation,
Defendant.

No. TCA 90–40152–WS.

United States District Court,
N.D. Florida,
Tallahassee Division.

Dec. 18, 1992.

Order Amending Findings
of Fact July 2, 1993.

M. Stephen Turner and David K. Miller, of Broad and Cassel, Tallahassee, FL, for plaintiff.

Edwin R. Hudson, of Henry, Buchanan, Mick, Hudson and Suber, Tallahassee, FL, for defendant.

STAFFORD, Chief Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

Plaintiff is the owner of approximately 3.52 acres of undeveloped property fronting Thomasville Road immediately north of what is now Dorothy B. Oven Park ["Oven Park"] in the City of Tallahassee, Leon County, Florida. Plaintiff's four count complaint pursuant to Title 42, United States Code, Section 1983, alleges violations of both his substantive and procedural due process rights, the takings clause, and a pendant state law claim for damages caused by the adjoining landowner's unlawful use of property. The court granted the parties' joint motion to sever issues for trial (document 36), and, accordingly, only counts I and III are before the court at this time.

In Count I, plaintiff alleges that the City of Tallahassee's ["City"] arbitrary and capricious actions violated both the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution. Plaintiff alleges that the City's application of the uncodified Thomasville Road policy on an *ad hoc* basis to reject some, but not all rezoning requests for prop-erty on Thomasville Road violates his right to substantive due process. Specifically, plaintiff argues that the City has, on several occasions, rezoned neighboring parcels to allow for non-residential use, but has refused to take similar action with respect to plaintiff's property. Furthermore, plaintiff alleges that the City's commercial use of the city-owned Oven Park violates the City's own zoning code and renders the City's failure to rezone plaintiff's property arbitrary and capricious. Plaintiff also alleges that the City's application of the vague and unstandardless Thomasville Road policy itself violates substantive due process.

Plaintiff also argues that because the City was interested in acquiring plaintiff's property, it had a pecuniary interest in plaintiff's rezoning application. According to plaintiff, this conflict of interest resulted in an unfair consideration of plaintiff's rezoning request. Finally, plaintiff argues that changes in the use of the property surrounding plaintiff's property make continuation of the current classification arbitrary. *See* document 46 at ¶ 53.

In Count III of the complaint, plaintiff alleges that his procedural due process rights under the United States Constitution were violated when the City failed to give him, as an adjacent property owner, notice and an opportunity to be heard before converting the Oven Park property to uses not authorized by the residential zoning classification. Specifically, plaintiff contends that the City violated its own zoning code (1) when it began renting out the Oven Park facilities, thereby converting the park from a permitted use to a commercial use in violation of Sections 4.2 and 6.5 of the City's Zoning Code and (2) when it constructed a fire station on the Oven property in violation of Section 6.5 of the City's Zoning Code. According to plaintiff, before converting the residentially-zoned property to these non-residential uses, the City was "required to engage in a formal rezoning process with notice to public or to affected owners." Document 46 at 21. The City's failure to provide such notice violates both Section 166.041, Florida Statutes and the United States Constitution.

Following the bench trial, the court has carefully considered the exhibits, the trial testimony and the written and oral presentations of the parties, and enters the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## II. FINDINGS OF FACT [1]

1. This is an action pursuant to Title 42, United States Code, Section 1983, brought by a property owner. The complaint seeks declaratory relief, damages, costs and attorney fees.

### A. The Area

2. Plaintiff CARY EVERETT, a resident of Chipley, Florida, is the owner of 3.52 acres of undeveloped real property fronting to the west on Thomasville Road in Tallahassee, Leon County, Florida. This property is the subject of the current lawsuit.[2]

3. Defendant CITY OF TALLAHASSEE is a municipal corporation which has the authority to enact zoning ordinances pursuant to the Municipal Home Rule Powers Act, Section 166.021, Florida Statutes. The Tallahassee–Leon County Planning Commission ["Planning Commission" or "Commission"] is an administrative agency of the city authorized to act in an advisory capacity to the City Commission. Tallahassee Code, § 18.-15.

4. The City has allowed the area north of plaintiff's property to be developed for commercial use, and has allowed non-residential office and commercial use to extend southward along Thomasville Road from the I–10 interchange to the immediate vicinity of the subject property.

5. The property adjacent to plaintiff's property on the south side, which was the Oven family residence in 1977, is now owned by the City itself. It is currently used as a

fire station and for City offices and commercial rental facilities known as Dorothy B. Oven Park ["Oven Park"].

6. Immediately south of Oven Park is a large Baptist Church. In 1984, the City permitted the church to add two office buildings (as accessory uses). Exhibit G to document 29. Post Road is approximately 1.4 miles south of the Baptist Church.

7. Proceeding north from plaintiff's property, in order, are the following parcels:

(a) Lucerne-in-the-Woodlands, zoned Planned Unit Development and developed as multifamily residential units.

(b) Moon property, rezoned in 1985 from agricultural to office-residential limited and redesignated on the land use map as office-transitional. The property is now developed as an office complex.

(c) Cureton Property, rezoned in 1984 from agricultural and residential use to office-transitional. The property is now developed as an office complex.

(d) Sun Bank Property, zoned Planned Unit Development and used for a drive-in banking facility with office space.

(e) Properties on each side of Lonnbladh Road and Metropolitan Boulevard, which join Thomasville Road from the northeast and east respectively, are zoned office-residential and commercial transitional.

(f) The Thomasville Road/Interstate 10 interchange, a major commercial zoned area.

8. Since 1977, when plaintiff purchased the subject property and included it as a residential component of a Planned Unit Development (P.U.D.), Thomasville Road in the subject area has been widened, elevated and improved from a two-laned road to a four-laned divided highway and the neighborhood has changed from predominantly undevel-

---

1. Any finding of fact which may be a conclusion of law shall be considered a conclusion of law. Conversely, a conclusion of law which may be a finding of fact shall be so considered.

2. Plaintiff's 3.52 acre frontage parcel is treated separately from plaintiff's adjoining property to the east because plaintiff's existing P.U.D. Con-

cept Plan identifies these as a separate parcels. Once a parcel is separately identified for development purposes, it is treated as separate for all other purposes. See Division of Admin., State Dept. of Transp. v. Jirik, 471 So.2d 549 (Fla. 3rd DCA 1985) (en banc), aff'd, 498 So.2d 1253 (Fla. 1986); document 46 at 13.

oped or residential use to mixed office and residential use.

### B. *City of Tallahassee Zoning Provisions*

9. Under Chapter 27, Section 6.5 of the City of Tallahassee Code of 1984, as amended, unrestricted uses permitted in an R–1 district are (1) single-family dwellings, (2) parks and playgrounds, and (3) cluster development. Restricted uses permitted in this zoning district are (1) churches and schools and (2) golf courses and country clubs.

10. Under Chapter 27, 6.13 of the Code, as amended, unrestricted uses permitted in an OR (Office and Residential District) are (1) single family dwellings, (2) two family dwellings, (3) multiple family dwellings, (4) townhomes, (5) apartment hotels, (6) rooming and boarding homes, (7) non-medical offices and services, (8) business offices and services, (9) nursing and rest homes, (10) churches and schools, (11) studios for photography, music, art, dance, drama and voice, and (12) cluster development. Restricted uses include (1) transient lodgings, (2) fraternity and sorority houses, private dormitories, (3) social, fraternal and recreational clubs and lodges (4) universities, colleges, public technical and vocational schools, (5) off street parking facilities, (6) sale, lease, rental of business machines, (7) medical offices and services, (8) convenience commercial uses as accessory to a residential transient lodging or office use (i.e. beauty or barber shops, laundromats, newsstands, drug stores, or restaurants), (9) kindergarten, nurseries and child care facilities, (10) financial institutions with drive through facilities, and (11) broadcasting studio.

### C. *The Thomasville Road Interchange Area Study and the Thomasville Road/Post Road Demarcation Policies*

11. As early as November 1969, the Tallahassee City Commission ["City Commission"] had stated a policy that Post Road would represent the northern boundary of non-residential zoning along Thomasville Road. On August 20, 1986, the City Commission reaffirmed this policy not to approve any nonresidential rezoning requests on Thomasville Road north of Post Road. Plaintiff's Exhibit 10 at 4.

12. In May, 1978, the Tallahassee–Leon County Planning Commission ["Planning Commission" or "Commission"], with technical assistance from the Tallahassee–Leon County Planning Department, prepared its "1–10/Thomasville Road Interchange Area Study Summary Report" ["Thomasville Road Study"] in response to a request by the Leon County Board of County Commissioners ["County Commissioners"]. *See* Defendant's Exhibit 3. As part of its report, the Planning Commission recommended that the County Commissioners and the City Commission adopt certain policies and goals for the management of development in the I–10/Thomasville Road area. These policy recommendations are synonymously referred to as the "Thomasville Road policy" or the "Post Road demarcation policy." These policy recommendations were never formally adopted by defendant in any ordinance or resolution. Plaintiff's First Request for Admissions ["RFA 1"] at ¶ 14.

13. This unofficial policy prohibits non-residential use for any property on this section of Thomasville Road, that is, any property north of Post Road and south of the Metropolitan Boulevard/I–10 Interchange. The City makes allowances, however, "for differing circumstances and conditions." Plaintiff's RFA 1 at ¶ 13. The City also notes that "other factors are considered." However, none of these "circumstances," "conditions," or "factors" are specified in any legislative enactment.

14. The Thomasville Road Study lists the following as some of the potential development problems:

a. If a firm nonresidential development stopping point is not identified, Thomasville Road could eventually become a commercial strip between Post Road and I–10.

b. If not sensitively handled, nonresidential development could encroach into existing residential neighborhoods.

c. Intensive development could transform Thomasville Road from what is now an attractive tree-lined thoroughfare into

a clutter of signs, power lines, and facades.

Defendant's Exhibit 3 at 3.

15. The Thomasville Road goals and policies pertinent to this case, as stated in the Thomasville Road Study, include:

a. *Goal: Protect Residential Neighborhoods from Commercial Encroachment. Policies:*

1. Use transitional developments such as office areas or medium-to-high density residential areas to separate commercial and low density residential areas.

2. Where non-residential/residential conflicts may occur, encourage developments to use the "Planned Unit Development" or "Limited Use" approach and make the best use of these by assuring either the compatibility of adjacent land uses or by providing the buffering necessary to adequately address potential conflicts.

b. *Goal: Preserve the Attractive Appearance of Thomasville Road. Policies:*

1. Prevent strip commercial development. Encourage instead, a concentration of non-residential development into compact commercial and office centers.

2. Prevent any non-residential development within that area bordering Thomasville Road shown on the land use plan as "open space" and "low density/mixed use residential."

c. *Goal: In the Interchange Area Create a Satellite Shopping and Employment Center Serving Northeast Leon County and the Region Policy:*

1. Locate office-residential developments in the I–10/Thomasville Road interchange where such developments can benefit from interchange access while providing a transition from commercial to low density residential areas.

Defendant's Exhibit 3 at 4–5.

16. One of the primary purposes of the I–10/Thomasville Road Study was to designate a stopping point for commercialization along the Thomasville Road corridor. At first, the study designated Raymond Diehl Road as this stopping point. Plaintiff's Exhibit 4A at 5. The large Office–Residential ("OR") area directly north of the Cureton property was intended to serve as a transitional area between the commercial uses north of Raymond Diehl Road and the residential uses intended to start at the Cureton property and extend southward.

### D. *The Cureton Property*

17. In 1984, the Planning Commission voted 3–2 to recommend approval of D.D. Cureton, III's request for a Land Use Plan Map Amendment from Open Space, Urban Undesignated, Medium Density Residential to Office–Transitional and for a change in zone classification from Agricultural 2 and Residence 1 to Office–Residence Limited Use with site plan on 7.44 acres fronting on the east side of Thomasville Road and lying directly south of its intersection with Live Oak Plantation Road. *See* Plaintiff's Exhibit 4A.

18. In its Comprehensive Plan Analysis, the Planning Commission noted that "[t]his parcel [the Cureton property] and all other parcels along the east side of Thomasville Road south to Woodgate Way are designated for Medium Density Residential (0–20 dwelling units per net residential acre)" with certain other conditions. Plaintiff's Exhibit 4A at 3. The property on the east side of Thomasville Road north of the [Cureton property] is designated Office–Transitional and is "intended to serve as a transition area between commercial uses to the north and residential uses to the south and to prevent retail commercial uses from extending southward along the Thomasville Road corridor." Plaintiff's Exhibit 4A at 3.

19. As previously noted, Raymond Diehl Road was the original stopping point for commercialization along the Thomasville Road corridor. In the Planning Commission's rezoning analysis of the Cureton Property, the Commission stated that

Approval of this rezoning request [Cureton Property] will result in a southward shift of OR land use and other parcels in the area will request the same right of development. There will be a strong argument to approve these requests, particularly on

the two parcels lying directly south of the request site.

By shifting the OR break line to the south[,] a· strong argument can be made for shifting the retail commercial ·zoning break line southward of Raymond Diehl Road. Applicants for commercial zoning will have the argument that since the OR buffer has been shifted southward, there is not reason to retain the OR zoning and buffer status on the northern parcels currently comprising the OR transition area. Approval of such requests could easily open the gateway for the commercialization of Thomasville Road.

Plaintiff's Exhibit 4A at 5.

20. At the public meeting the Commissioners heard both from citizens who supported the rezoning application as well as from citizens who expressed concern that altering the current boundary between commercial uses and residential uses at this time would "allow additional changes in the future which could be detrimental to the neighborhood." Plaintiff's Exhibit 4A at 53. Some of the Commissioners feared that approval of the rezoning request might be used as precedent for future rezoning requests.

21. The Commission voted 3–2 to adopt Ordinances No. 84–0–2322 and 2323, thereby approving D.D. Cureton, III's request for a Land Use Plan Map Amendment from Open Space, Urban Undesignated, Medium Density Residential to Office–Transitional and for a change in zone classification from Agricultural 2 and Residence 1 to Office–Residence Limited Use.

### E. The Moon Property

22. In 1985, the Planning Commission voted 5–0 to recommend approval of a land use plan amendment rezoning Lester Moon's property from Medium Density Residential and Urban Undesignated to Office–Transitional and for a change in zone classification from Agricultural 2 and Residence 2 to Office–Residence Limited Use with site plan on 16.45 acres fronting on the east side of Thomasville Road and lying approximately 650 feet south of Metropolitan Boulevard. See Plaintiff's Exhibit 4B.

23. In its Comprehensive Plan analysis, the Planning Commission noted

The parcel to the south [Lucerne in the Woodlands] has been zoned [ ] residential and is currently being developed. Therefore, that tract does provide a break point for future rezonings to the south. However, ... by shifting the OR break point further south a strong argument can be made for shifting the retail commercial zoning south of Raymond Diehl Road on the east side of Thomasville Road. Applicants for commercial zoning can make the argument that since the OR buffer has shifted southward, there is no reason to retain one-half mile of OR frontage as buffer.

Plaintiff's Exhibit 4B at 6 (emphasis added). The Planning Commission "felt that even though the request was inconsistent with [the] 1978 Interchange Plan, [ ] this application would be the last non-residential application possible since zoning and land use south of the request is developing residentially." Id. at 7.

24. The City Commissioners unanimously voted to adopt the Ordinances permitting rezoning of the Moon property.

### F. The Oven Park Rental Facilities and Fire Station

25. In 1985, W.J. Oven, Jr., conveyed his residence to the City for "park purposes only." The conveyance negotiated by the City authorized construction of a fire station on the northwest section of the property. In 1987, the City began renovations to formerly residential structures on the park property to convert them to public meeting rooms and City offices.

26. At approximately the same time as the City began renovations to the Oven Park facilities, construction began on a fire station on the northwest corner of the park property immediately adjacent to and just south of plaintiff's property. The City's building permit application for the fire station recited that the "fire station is a city utility and exempt from zoning." See Plaintiff's Exhibit 5 at 2. The City's chief planning official, Martin Black, testified that the City considered the utility exemption applicable to the

fire station. The fire station operates 24 hours a day, seven days a week. The building is situated so that the garages for the fire trucks open in the direction of plaintiff's property.

27. Both the parking area for fire station vehicles and the parking lot at Oven Park front plaintiff's property.

28. The City originally acquired a parcel located at Thomasville Road and North Ride Road, closer to the downtown area as a site for construction of the fire station. *See* Deposition of Daniel A. Kleman, Plaintiff's Exhibit 1 at 9. The City met with citizens who lived in the North Ride neighborhood (near the proposed fire station site) and several residents of the North Ride neighborhood objected to having the fire station near their homes. *Id.* at 12. Although Kleman recommended that the City construct the fire station on the North Ride site, the City Commission decided to build its fire station adjacent to plaintiff's undeveloped property instead. Kleman depo. at 9. The court finds that opposition from citizens who lived in the North Ride neighborhood played a significant part in the City's decision not to locate the fire station at the North Side Road site. *See* Exhibit 3 to Kleman depo.

29. The City then conducted meetings with citizens of the Rose Hollow neighborhood (located adjacent to Oven Park). Kleman depo. at 17–18. Unlike the proposed North Ride site, the City did not consult with or notify plaintiff of its plan to build the fire station on the adjacent property. *Id.* at 22, 42–43. No public hearing was held regarding plans to build the fire station on the Oven Park property. *Id.* at 40.

30. The Oven Park property and fire station are zoned R–1 (Single Family Residential) under the Tallahassee–Leon County Zoning Code ("the Zoning Code"). As previously stated, unrestricted uses permitted in an R–1 district are (1) single-family dwellings, (2) parks and playgrounds, and (3) cluster development, while permitted restricted uses are (1) churches and schools and (2) golf courses and country clubs.

31. The City never sought nor obtained any type of waiver or variance or any special or conditional use permit to operate the fire station or the rental facilities on the Oven Park property adjacent to plaintiff's property. Furthermore, the City violated its own Thomasville Road policy by failing to include a 100–foot landscaping buffer area along Thomasville Road. The city manager, Daniel Kleman, was "of the understanding that a fire station can be located in any zoning category under the City zoning codes." Kleman depo. at 39. In its building permit application, the City indicated that because the fire station is a city utility, it is exempt from zoning regulations. Plaintiff's Exhibit 5 at 2.

32. Notwithstanding this zoning designation, the City's building permit for the rental facility shows its intended use(s) as a public park, public meeting rooms and City offices. *See* Plaintiff's Exhibit 6. These public meeting rooms are rented to organizations and individuals for private use. Organizations or persons who pay defendant a rental fee are given exclusive use of the facilities and may host private parties or receptions, weddings and other social events, seminars or classes for which tuition is charged, or sales of goods to the public. *See* Deposition of Deborah Pullen, Plaintiff's Exhibit 2. The private functions at the park are permitted to have live music and serve alcoholic beverages. Those who rent the facilities must sign a lease or rental agreement and pay a fee which is competitive with fees charged for the use of commercial facilities elsewhere in the City. The City advertises and promotes this rental operation as the only city park available for hire, and the park facility competes with similar private facilities in Tallahassee such as the Tallahassee Garden Club, the Women's Club at Los Robles, the Brokaw–McDougall House and the Riedel House. Pullen depo. at 21. The Oven Park facilities are available for rental between the hours of 7:00 A.M. and 11:00 P.M., seven days a week.

33. The City offices located on the park include those of Ms. Pullen and Mr. Ferrar's as well as the that of the foreman of horticultural operations of the park. Pullen Depo. at 12.

34. The City classifies parks into three types: "active," "passive" and "active/passive." Facilities likely to be found at an active park include, but are not limited to, community centers, ball fields, tennis courts, swimming pools, and supervised playgrounds. Facilities generally found at passive parks include, but are not limited to, open space play areas, picnic shelters, park benches, gardens and nature, hiking and jogging trails. *See* Parks and Recreation Ordinance, Tallahassee City Code, § 14–113.

### G. *Plaintiff's Proposed P.U.D. Amendment*

35. Plaintiff's property is zoned "P.U.D. Concept" pursuant to a Planned Unit Development Concept Plan approved in 1978. The P.U.D. Concept Plan for the 3.52 acres fronting Thomasville Road (component A) allows a "low-density residential use" of 4.0 dwelling units per net residential acre.

36. The original P.U.D. was approved in August 1978 and allowed for development of single family housing at a density of four dwelling units per acre. In its application for zoning review, plaintiff contended that "the addition of the fire station and the office uses within Oven Park adjacent to the site have made [plaintiff's site] unusable under [the four dwelling units per acre] restriction" and sought to modify component A of the original P.U.D. to allow for office-residential ["OR"] uses. *See* Plaintiff's Exhibit 9 at i.

37. In October 1989, plaintiff filed his request for the P.U.D. amendment seeking approval for office-residential uses on the subject parcel. The proposed concept plan identified the proposed general use concept, and remains subject to final detailed plan approval procedure.

38. On January 10, 1990, the Planning Commission voted to recommend denial as contrary to the City's policy for land use decisions along Thomasville Road as described in the 1978 Thomasville Road study designating this segment of the road for residential use. *See* Plaintiff's Exhibit 10. The Planning Commission also viewed the request as intruding into the residential area and disrupting the transition provided by the multi-family property to the north. In its Comprehensive Plan Analysis, the Planning Commission determined that plaintiff's proposal was consistent with the Future Land Use Plan Map but inconsistent with the Locational Policies of the Plan. As to the Element Policies, the Commission determined that it was consistent overall, promoting four policies and hindering four policies. Specifically, the proposal promoted those policies which encourage urban infill and development in areas served by city sewer, but hindered those policies which discourage isolated office or commercial development. Plaintiff's Exhibit 10 at 4. The Planning Commission found that

> The Comprehensive Plan encourages Office–Transitional uses to occur in areas in transition or between residential and non-residential uses. [Plaintiff's] request does not function as a transition but rather as an intrusion of non-residential uses into a residential area.

Plaintiff's Exhibit 10 at 5.

39. The Planning Commission, in recommending that the City Commission deny plaintiff's proposed P.U.D. Amendment

> viewed [plaintiff's] request as being contrary to the policies adopted by the City Commission for land use decisions along the Thomasville Road corridor. The I–10/Thomasville Road study, which was the basis for the City Commission's policy, designated this segment of the corridor for residential uses. Commissioners felt that OR allows for uses which are of "commercial: character which is contrary to the established policy and the residential pattern of development in the area. Commissioners also noted that the I–10/Thomasville Road policy established a graduated intensity of uses along the eastern side of the corridor with the most intense commercial and office/commercial districts being located nearest the interchange and decreasing in intensity through office and multi-family as one moved southward along the corridor to provide an orderly transition to the single family uses south of Oven Park. It was felt that to allow OR uses on the request site would be inconsistent with location policies of the Comprehensive Plan, intrusionary, and disruptive

to the current transition provided by the multifamily properties to the north. Plaintiff's Exhibit 10 at 6.

40. At the March 7, 1990 meeting, Mr. Black advised the commissioners that the Planning Commission and staff viewed Everett's request as "being inconsistent with the Commission's adopted policy on land uses in the Thomasville Road/I–10 area, i.e., to not approve any non-residential rezoning requests on Thomasville Road north of Post Road (north of the Sun Bank property)."[3] Defendant's Exhibit 12 at 30 (Minutes of the March 7, 1990 Commission Meeting). The Commission decided to adhere to its policy which established Post Road as the demarcation line for non-residential development. *Id.* at 31.

41. On March 7, 1990, defendant's Board of City Commissioners ("the City Commission"), after reviewing the report and recommendations of the Planning Commission, voted to deny plaintiff's P.U.D. amendment application stating the "Thomasville Road policy" as the reason for the denial. The City Commission did not indicate any other reason for its action.

42. In February, 1990, approximately one month before it denied plaintiff's proposed P.U.D. amendment, the City had approved a proposed new comprehensive plan which included a future land use map designating plaintiff's parcel as "mixed use B." The "mixed use B" designation includes the office-residential use for which plaintiff applied. Deposition of Martin Black, Plaintiff's Exhibit 12 at 12.

42A. At the time plaintiff's proposed P.U.D. amendment was considered, the future land use map was not the "codified" or the officially adopted future land use map, but was only a proposal subject to review by the Florida Department of Community Affairs and further amendment or approval by the City. Nevertheless, according to Mr. Black, "there was an intent to have a mixed use overlay in [the] area [of plaintiff's property]" in February, 1990. Furthermore, even prior to February 1, 1990, "the City was aware that [the future land use map, if found to have met the State requirements] was going to be the policy." Black Depo. at 14.

43. Although the future land use map was not yet formally approved by the State, making it "only a proposal subject to review by the Florida Department of Community Affairs and further amendment or approval by the City," document 62 at ¶ 3, the fact that the City adopted an ordinance presenting the plan to the State for approval evidences the City's intent to designate plaintiff's property as "mixed use B." There is simply no evidence that the City intended to change the "mixed use B" designation for the property in question, even though the City could conceivably have done so before or after Departmental approval.

H. *The City's Interest in Purchasing Plaintiff's Property*

44. During the period renovations were in progress on the Oven Park facilities, the City became interested in acquiring plaintiff's property for the expansion of Oven Park.

45. City officials told plaintiff's broker that while the City was interested in acquiring the subject property for expansion of Oven Park, plaintiff's asking price of $550,-

---

3. According to defendants,

The documents before the City Commission when it subsequently denied the rezoning of the Plaintiff's property on March 7, 1990, indicate that it considered what the Planning Commission had considered before it, namely that the rezoning request was inconsistent with existing land uses in the area, and with the "Thomasville Road Study," *and that the request was also inconsistent with locational policies of the Comprehensive Plan.* Thus the City Commission's denial of the rezoning request was based on consideration of a number of relevant criteria.

Document 42 at 4 (emphasis added). The Minutes of the March 7, 1990 City Commission meeting cites only the Thomasville Road Policy as the reason why plaintiff's rezoning application was denied. It makes no mention of the "locational policies of the Comprehensive Plan. *See* Defendant's Exhibit 12 at 29–31.

The Planning Commission, however, did indicate its belief "that to allow OR uses on the request site would be inconsistent with location policies of the Comprehensive Plan." Plaintiff's Exhibit 10 at 6. However, it did not specify then, nor does the City specify now, the specific policies of the Plan with which plaintiff's proposal would be inconsistent.

000 for the Thomasville Road frontage was too high. However, another potential purchaser offered to buy a portion of the subject property if office-residential use could be permitted.

46. At the March 7 meeting, Senior Assistant City Attorney Hurley stated that the possibility of donations of the property or City purchases of property was irrelevant to Everett's rezoning request. Document 12 at 31; Document 11 at 8. Yet, when it denied plaintiff's rezoning application, the City stated that "[t]his office feels [plaintiff's] land values are high, given the R–1 zoning for the Thomasville Road frontage and the existence of low and wet lands." Document 7 at 1.

### III. CONCLUSIONS OF LAW

#### A. Procedural Due Process

Plaintiff contends that the City violated plaintiff's procedural due process and state law rights when it converted its adjoining property to non-residential uses. Specifically, plaintiff argues that the City should have given him notice and an opportunity to object both to its location of a fire station and to its commercial use of the Oven Park facilities. The City argues that it was not required by any provision in either the United States or Florida Constitutions, or by a state statute or a local ordinance to notify plaintiff of its intention to locate a fire station and public park on adjoining property.

■ It is clear that an action under section 1983 may be brought for a violation of procedural due process. *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). In procedural due process claims, "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*"

---

4. In some circumstances, the Court has held that "a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Zinermon,* 494 U.S. at 128, 110 S.Ct. at 984. These cases usually involve either the "necessity of quick action by the State or the impracticality of providing any predeprivation process." *Id.* (quoting *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908,

*Zinermon,* 494 U.S. at 125, 110 S.Ct. at 983 (emphasis in original). In procedural due process cases, the constitutional violation under § 1983 is "not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Zinermon,* 494 U.S. at 126, 110 S.Ct. at 983. "Due process," as defined by the United States Supreme Court, is "a flexible concept that varies with the particular situation." *Zinermon,* 494 U.S. at 127, 110 S.Ct. at 984. To determine what procedural protection the Constitution requires in a particular case requires a weighing of several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Zinermon,* 494 U.S. at 127, 110 S.Ct. at 984 (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)). Applying this test, the Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon,* 494 U.S. at 127, 110 S.Ct. at 984 (emphasis in original) (citing *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985)). That is, "[p]ost-deprivation remedies do not provide due process if pre-deprivation remedies are practicable." *Fetner v. Roanoke,* 813 F.2d 1183, 1186 (11th Cir.1987).[4]

■ To establish a procedural due process violation, plaintiff must show (1) that they had a property interest which was interfered with by the state and (2) that the state failed to use constitutionally sufficient proce-

---

68 L.Ed.2d 420 (1981)) (overruled in part, not relevant here, by *Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986)). Because in this case, the City was not required to act quickly and because a predeprivation hearing was practical, even a postdeprivation hearing would not have satisfied due process. In any event, neither a pre- or postdeprivation hearing occurred in this case.

dures in depriving plaintiff of that right. *First Assembly of God v. Collier County*, 775 F.Supp. 383 (M.D.Fla.1991) (citing *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). The initial determination of whether plaintiff has a protectable property interest is governed by state law. *Loudermill*, 470 U.S. at 538, 105 S.Ct. at 1491. However, "the constitutionality of the procedures used by the state in depriving [plaintiff] of a protected right does not turn on the procedures mandated by state law;" rather, plaintiff must show not just a violation of a state statute, but a violation of the United States Constitution. *First Assembly of God*, 775 F.Supp. at 388–89 (citing *Harris v. Birmingham Board of Education*, 817 F.2d 1525, 1527–28 (11th Cir.1987)).

■ In Florida, an adjacent property owner has a property right in the protection of his own property against incompatible uses of adjacent property which devalue his property. *See WAGS Transp'n System, Inc. v. Miami Beach*, 88 So.2d 751 (Fla.1956). The City argues that municipalities have no duty under either state law or federal constitutional law to provide notice to citizens situated similarly to plaintiff in this case. Document 42 at 6. The City further contends that "[because] the City is not constrained by legislative or constitutional provisions in choosing a location for a fire station or park, [it] does not have to provide notice to the public of its intent to locate these kind of facilities in a particular area unless notice is required by a provision in the United States Constitution." Document 42 at 6. As previously stated, the Constitution generally requires some kind of notice before the state deprives a citizen of property. To decide whether plaintiff's due process rights were violated, it is helpful to consider two sub-issues: (1) whether the City is bound by the provisions of its own zoning ordinance[5] and (2) whether the City's failure to give plaintiff notice and an opportunity to object to the location of the fire station and to the commercial use of park facilities violates plaintiff's procedural due process rights.

1. *The City is Bound by its Own Zoning Ordinance When Acting in Either a Governmental or Proprietary Capacity.*

In Florida, the question of whether a governmental entity is bound by its own zoning restrictions when acting in its governmental, as opposed to its proprietary, capacity is not entirely clear. Early cases distinguished between acting in a governmental capacity and acting in a proprietary capacity, holding that whereas "in the performance of [a governmental] activity, a governmental body need not comply with its own zoning ordinances," *AIA Mobile Home Park, Inc. v. Brevard County*, 246 So.2d 126, 131 (Fla. 4th DCA 1971) (quoting *Nichols Engr. & Research Corp. v. State*, 59 So.2d 874 (Fla.1952)), if the governmental body is acting in a proprietary capacity, it "is governed by the zoning regulations of the area in the absence of specific legislative pronouncement to the contrary." *Treasure Island v. Decker*, 174 So.2d 756, 759 (Fla. 2nd DCA 1965). *See* Annotation, 61 A.L.R.2d 970; *See also Nehrbas v. Lloyd Harbor*, 2 N.Y.2d 190, 159 N.Y.S.2d 145, 140 N.E.2d 241 (1957).

According to plaintiff, however, the Florida Supreme Court receded from these cases in *Parkway Towers Condominium Assoc. v. Metropolitan Dade County*, 295 So.2d 295, 295–96 (Fla.1974), holding that a city is bound by the provisions of its own zoning code absent an express applicable exemption. In understanding the Supreme Court's decision, it is helpful to first examine the Second District Court of Appeal's opinion in the case.

In *Metropolitan Dade County v. Parkway Condominium Ass'n*, 281 So.2d 68 (Fla.3rd DCA 1973), property owners challenged the county's determination to locate a facility for the housing of prisoners and the implementa-

---

**5.** The City appears to contend that if a municipality is not bound by its own zoning ordinance, its placement of a non-conforming facility without giving adjacent landowners an opportunity to be heard would not violate procedural due process. The court does not completely understand the City's argument relating procedural due process and its right to place a fire station and commercial rental facility in a residential area; because this court finds that a municipality *is* bound by its own zoning ordinance, however, it is not necessary to address this issue.

tion of a work release program on certain property located in the unincorporated area of Dade County, zoned GU "Interim Use District." Plaintiffs alleged that the county was not complying with its own zoning procedures and was taking plaintiffs' property without just compensation. The county contended that the erection of a jail facility was a governmental function and that the county was not required to seek a zoning change on the property involved before erecting such a facility. In support of its contention, the county cited cases which "recognize[d] that under the common law a governmental entity may place a governmental facility without regard to a comprehensive zoning ordinance or its procedures." *Metropolitan Dade,* 281 So.2d at 69 (citing, *e.g., Nichols Engineering & Research Corp. v. State ex rel. Knight,* 59 So.2d 874 (Fla.1952); *AIA Mobile Home Park,* 246 So.2d at 131; *Treasure Island,* 174 So.2d at 759. Plaintiffs conceded this general principle of law, but contended that the county, in the adoption of the comprehensive zoning ordinance pursuant to the Metropolitan Home Rule Charter, waived this privilege because the ordinance provided that the procedures for changing the comprehensive zoning plan shall be the exclusive method of alteration. *See Metropolitan Dade,* 281 So.2d at 69. The district court of appeal agreed with the defendants, holding that

> [the county] possessed the right at common law to place a governmental function on any site selected within the County as directed by the Board of County Commissioners and that, in order to waive this privilege, there must be some affirmative showing of such waiver by action taken in the adoption of the zoning ordinance. No such is found; no reference to jail facilities is found in the comprehensive zoning ordinance.

*Metropolitan Dade,* 281 So.2d at 69. The Florida Supreme Court issued a writ of certiorari, but later determined that issuance of the writ was improvident. In a written opinion, however, the court receded prospectively from the prior decisions which entitled government property to a common law exemption from zoning restrictions:

> [I]t is nevertheless our view prospectively that zoning variations to accommodate county or municipal facility purposes should either have been anticipated in zoning ordinances before construction or operation of such facilities is commenced, or, if this has not been done, construction should not be undertaken thereof until after due modification or change therefor is made in existing zoning ordinances.

*Parkway Towers,* 295 So.2d at 296.

In *Temple Terrace v. Hillsborough Assoc. for Retarded Citizens, Inc.,* 322 So.2d 571, 577 (Fla. 2nd DCA 1975), *aff'd,* 332 So.2d 610 (Fla.1976), the Second District Court of Appeal held that the "balancing of interests" test, as opposed to the "governmental-proprietary," "power of eminent domain" or "statutory guidance" tests, applies when one governmental unit seeks to use land located in another governmental unit's jurisdiction contrary to applicable zoning regulations of the host government. In its discussion of the governmental-proprietary test, the court noted that although "[t]he wisdom of the governmental-proprietary test is subject to question," it continues to apply in Florida "where a governmental unit seeks to violate its own zoning ordinance." *Temple Terrace,* 322 So.2d at 577 (citing *Orange County v. Apopka,* 299 So.2d 652 (Fla. 4th DCA 1974)). This case, decided after *Parkway Towers,* was affirmed by the Florida Supreme Court in *Hillsborough Assoc. for Retarded Citizens, Inc. v. Temple Terrace,* 332 So.2d 610 (Fla. 1976). In affirming the Second District Court of Appeal, the Supreme Court stated that

> The opinion authored by Judge Grimes below has also simplified our task, being a craftsmanlike product which has fully explored and evaluated the issues and their legal effects. We cannot improve on his analysis, and it would serve no purpose to rephrase it. We adopt his opinion as our own.

*Temple Terrace,* 332 So.2d at 612.

In *Parkway Towers,* the Supreme Court indicated its intent to *prospectively* recede from those cases holding that a governmental unit is exempt from its own zoning restrictions while acting in a governmental capacity. Although this issue was not directly before

the court in *Temple Terrace,* in dicta, the Second District Court of Appeal (and the Supreme Court by its affirmance) noted that the governmental-proprietary function test still applied when one governmental unit sought to violate its own zoning ordinance. This court has not found any opinions since *Temple Terrace* or *Parkway Towers* addressing the issue of whether a governmental unit is exempt from its own zoning laws while acting in a governmental capacity. The Supreme Court's decision in *Parkway Towers* is persuasive, *see, e.g. Weisenberg v. Carlton,* 233 So.2d 659 (Fla. 4th DCA 1970), *cert. denied,* 240 So.2d 643 (Fla.1970); *Horton v. Unigard Ins. Co.,* 355 So.2d 154 (Fla. DCA 1978), *cert. dismissed,* 373 So.2d 459 (Fla. 1979) and, although the Court's decision in *Parkway Towers* might appear to be inconsistent with its decision in *Temple Terrace,* because the *Parkway Towers* case squarely addressed the issue of whether a governmental entity is subject to its own zoning code when acting in a governmental capacity, this court shall follow *Parkway Towers.*[6]

■ Both Article VIII, Section 2(b) of the Florida Constitution and the Florida's Municipal Home Rule Powers Act, Chapter 166, Florida Statutes permit Florida municipalities to do anything that fulfills a municipal purpose that they are not expressly prohibited from doing by the United States or Florida Constitutions, general or special laws, or a county charter. *See Boca Raton v. Gidman,* 440 So.2d 1277 (Fla.1983). The court finds that a fire station fulfills a municipal purpose and is, therefore, an example of the city acting in a governmental capacity[7]. *See* Tallahassee, Fla.Code, §§ 7–19 and 14–111. However, the Florida Supreme Court in *Parkway Towers* makes it clear that either

zoning variations to accommodate city purposes should be anticipated in zoning ordinances before construction is commenced or construction should not be undertaken until the zoning ordinance is changed to accommodate the proposed construction.

■ The only zoning variation anticipated in the Zoning Code of the City of Tallahassee and Leon County, Florida is contained in Section 1.3. That section provides that

> Nothing in this chapter shall prevent the construction and maintenance of any public utility or municipal utility service lines or structures necessary for the distribution of public utility or municipal utility service to any part of the City of Tallahassee or County of Leon.

Because neither a fire station nor rental facility qualifies as a utility, this exemption does not apply in the case at bar. Accordingly, pursuant to the Supreme Court's decision in *Parkway Towers,* construction of the fire station should not have occurred until the zoning ordinance was changed to accommodate the proposed construction.

Before converting the Oven Park property to uses not authorized by the residential zoning classification, the city was required to engage in a formal rezoning proceeding in accordance with Section 166.041, Florida Statutes.[8] Section 166.041(3)(a), Florida Statutes provides, in pertinent part, that

> Except as provided in paragraph (c), a proposed ordinance ... shall, at least 10 days prior to adoption, be noticed once in a newspaper of general circulation in the municipality. The notice of proposed enactment shall state the date, time, and place of the meeting.... The notice shall

**6.** As previously stated, the issue in *Temple Terrace* was which test should apply when one governmental unit seeks to violate the zoning code of another governmental unit.

**7.** As stated in *AIA Mobile Home Park,* 246 So.2d at 130–31.

> The distinction between acts in the performance of governmental functions and those in the performance of a corporate or proprietary function is that in the case of the former, the municipal corporation is executing the legislative mandate with respect to the public duty

generally, while in the other, it is exercising its private rights as a corporate body.

**8.** Section 166.041(3)(a) states the notice requirements for the adoption of a municipal ordinance. Ordinances "which rezone specific parcels of private real property or which substantially change permitted use categories in zoning districts" are subject to the more rigid requirements of Section 166.041(3)(c). This case involves the rezoning of *public* real property. Because no notice was given to plaintiff, it is immaterial (and this court need not decide) whether section 166.041(3)(a) or 166.041(3)(c) governs this action.

also advise that interested parties may appear at the meeting and be heard with respect to the proposed ordinance.

Ordinances which fail to strictly comply with the statutory procedures are null and void. *Southern Entertainment Co. v. Boynton Beach*, 736 F.Supp. 1094 (S.D.Fla.1990); *David v. Dunedin*, 473 So.2d 304 (Fla. 2nd DCA 1985). *See generally*, Radson & Miller, "A Local Government Ordinance May Not Be the Law," 66 *Fla.B.J.* 53 (Nov. 1992).

Defendant argues that plaintiff had no constitutional right to notice or an opportunity to be heard. Document 42 at 6. In *Pennick v. Florala*, 529 F.2d 1242, 1243 (5th Cir.1976), plaintiffs alleged that the failure of the city to give them notice and an opportunity to be heard "prior to a change in zoning or to the initiation of garbage disposal operations" violated their procedural due process rights. The court of appeals affirmed the district court's dismissal of the procedural due process violations alleged in connection with the *initiation* of the landfill. As to the *continued operation* of the landfill, however, the court of appeals affirmed on another ground:

> The continued operation of the facility, as opposed to its construction, obviously does not deprive plaintiffs of the procedural due process guarantees of notice and an opportunity to be heard.

*Pennick*, 529 F.2d at 1243. The court distinguished between a procedural due process right in the *construction* of a facility and a similar right in its *continued operation*. Although there is no procedural due process right in the latter, this statement implies that there would be one in the former.

■ Although a "violation of a state statute outlining procedure does not necessarily

equate to a due process violation under the United States Constitution," *Harris v. Birmingham Board of Education*, 817 F.2d 1525, 1528 (11th Cir.1987), in this case, the court finds that the City's placement of the fire station on the Oven Park property without following the statutory procedures for rezoning violates plaintiff's procedural due process rights under the United States Constitution. After weighing of the factors enunciated in both *Eldridge* and *Zinermon*, the court concludes that (1) the private interest affected by the official action is important, (2) the risk of an erroneous deprivation of the interest would be substantially reduced had the government afforded plaintiff notice and an opportunity to be heard prior to its construction of the fire station and renovation to Oven Park and (3) such a predeprivation hearing could have been conducted at minimal cost to the government.

### B. *Substantive Due Process*

The right not to be subject to "arbitrary or capricious" action by a state, either by legislative or administrative action, is commonly referred to as a "substantive due process right." *Pearson v. Grand Blanc*, 961 F.2d 1211, 1217 (6th Cir.1992). Although the Supreme Court has explicitly observed that citizens have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions, *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977), the circuits disagree as to the role of a federal court in reviewing zoning claims of this kind. *Pearson*, 961 F.2d at 1217.

■ The test in this circuit[9] as to whether there has been a violation of sub-

---

9. The court in *Pearson* noted the similarity between the Ninth Circuit's approach and the Eleventh Circuit's approach as concerns substantive due process.

> The Ninth Circuit will subject local zoning decisions to substantive due process review, but the scope of review is that for legislation, even as to an individual property owner's claim, and any relationship to a proper zoning

goal, such as prevention of traffic congestion, will be sufficient.

&ast; &ast; &ast; &ast; &ast; &ast;

> The Eleventh Circuit approach is similar to the Ninth. Indeed, the Ninth Circuit relied on an Eleventh Circuit decision [*Eide v. Sarasota County*, 908 F.2d 716].

*Pearson*, 961 F.2d 1211, 1219. Accordingly, Ninth Circuit zoning decisions concerning substantive due process are persuasive.

stantive due process in the context of section 1983 is twofold. It must be first determined whether there has been a deprivation of a federal constitutionally protected interest, and then, whether the deprivation, if any, is the result of an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation. *Rymer v. Douglas County,* 764 F.2d 796, 801 (11th Cir.1985); *Greenbriar, Ltd. v. Alabaster,* 881 F.2d 1570, 1577, *reh'g denied en banc,* 893 F.2d 346 (11th Cir.1989). *See also Executive 100 v. Martin County,* 922 F.2d 1536, 1541 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991). A substantive due process claim, unlike a just compensation claim, does not require denial of all reasonable use of the property; it is sufficient that the government has arbitrarily or irrationally interfered with the owner's right to a particular use. *See e.g. Greenbriar,* 881 F.2d at 1576 n. 11.

Plaintiff's substantive due process claim alleges that defendant's denial of his rezoning application was "arbitrary, capricious and not reasonably related to the public health, safety, and welfare and violated plaintiff's right to substantive due process. Document 1 at 6. Specifically, plaintiff contends that the city's application of the standardless and uncodified Thomasville Road policy in an *ad hoc* manner is arbitrary and unreasonable. Document 46 at 14. According to plaintiff, it is "arbitrary and an abuse of governmental power for the City to authorize commercial and other nonresidential uses for its own property, while summarily denying Plaintiff any right to develop similar uses on adjacent property." Document 46 at 15. Plaintiff also argues that the changes in the use of surrounding property on Thomasville Road make the continuation of a restricted use classification arbitrary. Document 46 at 15. Furthermore, according to plaintiff, it is "arbitrary and an abuse of governmental power for the City to authorize commercial and other nonresidential uses for its own property, while summarily denying Plaintiff any right to develop similar uses on adjacent property." Document 46 at 15. Finally, plaintiff alleges that the city acted with an unfair or discriminatory motive because the City, having an interest in acquiring plain-

tiff's property at minimal cost, had an interest in denying the variance in order to keep the property's value low.

■ "Federal courts do not sit as zoning boards of review and should be most circumspect in determining that constitutional rights are violated in quarrels over zoning decisions." *Spence v. Zimmerman,* 873 F.2d 256, 262 (11th Cir.1989). A federal court should show deference for the local authority's professional judgment and may not override it "unless it is such a substantial departure from accepted ... norms as to demonstrate that the [decisionmaker] ... did not actually exercise professional judgment." *Pearson,* 961 F.2d at 1222. In other words, "[o]ur function in this type of case is to ascertain whether there has been a transgression upon the property owner's constitutional rights." *Cowart v. Ocala,* 478 F.Supp. 774 (M.D.Fla.1979). A violation of state law, without more, is not a denial of due process of law. *Coniston Corp. v. Hoffman Estates,* 844 F.2d 461 (7th Cir.1988) (citing *Hebert v. Louisiana,* 272 U.S. 312, 316, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926)).

### 1. *Changed Circumstances*

■ Plaintiff argues that the changes in the use of surrounding property make the denial of his rezoning request arbitrary. Florida courts have struck down zoning classifications in cases where "changed conditions created a situation where the zoning of [a plaintiff's] property is so unreasonable as to constitute a taking of his property," *Stokes v. Jacksonville,* 276 So.2d 200, 204 (Fla. 1st DCA 1973) (quoting *Manilow v. Miami Beach,* 213 So.2d 589 (Fla. 3rd DCA 1968)). These changes must be "sufficient" and "substantial." *See e.g. Miami Beach v. Parking Facilities, Inc.,* 120 So.2d 209, 211 (Fla. 3rd DCA 1960), *cert. denied,* 125 So.2d 873 (Fla. 1960). Because "[c]ourts are not empowered to act as super zoning boards substituting their judgment for that of the legislative and administrative bodies exercising legitimate objectives, *S.A. Healy Co. v. Highland Beach,* 355 So.2d 813 (Fla. 4th DCA 1978), a court will not substitute its judgment for that of city officials on the question of zoning classifications when the matter is "fairly de-

batable." *Miami Beach v. Prevatt*, 97 So.2d 473 (Fla.1957), *cert. denied*, 355 U.S. 957, 78 S.Ct. 543, 2 L.Ed.2d 532 (1958).

The court in *Stokes* found that changed circumstances rendered the subject property unsuitable for single family residential zoning. When plaintiffs originally purchased their homes many years ago, the subject area was a "relatively quiet residential area." *Stokes*, 276 So.2d at 204. Since that time, the two-laned highway upon which their home was built was expanded into a six-lane thoroughfare "continuously traversed by noisy, smoke and fume emissioning behemoths which rendered their residences almost uninhabitable. *Id.* Furthermore, the city permitted three separate service stations to be constructed to the north, northwest and west of plaintiffs' property. Finally, the area directly across the street was "intensely" developed as a commercial area. Ordering the city to rezone plaintiffs' property, the court noted that it was the sovereign—and not the plaintiffs—that permitted the neighborhood to transform into a commercial area and held that the city's refusal to rezone plaintiffs' property was not "fairly debatable" and "exceed[ed] the bounds of necessity for the public welfare and was therefore arbitrary." *Id.* at 204–5. *See also Bailey v. St. Augustine Beach*, 538 So.2d 50 (Fla. 5th DCA 1989), *review denied*, 545 So.2d 1366 (Fla.1989); *Manilow v. Miami Beach*, 213 So.2d 589 (Fla. 3rd DCA 1968), *cert. dismissed*, 226 So.2d 805 (Fla.1969); *South Miami v. Hillbauer*, 312 So.2d 241, 242 (Fla. 3rd DCA 1975) (affirming trial court's decision finding single family residential zoning to be "arbitrary, unreasonable and without a fairly debatable relationship to the public health, safety, morals or general welfare).

Similarly, the court in *Olive v. Jacksonville*, 328 So.2d 854 (Fla. 1st DCA 1976), found unconstitutional the city's refusal to rezone plaintiffs' property from residential to commercial classification. In that case, plaintiffs' property was surrounded on three sides by commercially zoned property and on one side by residentially zoned property. At the time plaintiffs purchased their property, the "entire surrounding area was devoted to single-family residences and none of the roads were paved." *Olive*, 328 So.2d at 854. However, with the passage of time, the character of plaintiffs' neighborhood changed. Behind plaintiffs' property was now a dairy store, a hamburger restaurant, a drug store and a gas station. A shopping center and fast food restaurant had been proposed for the property adjacent to that of plaintiffs. The court acknowledged that a "line [dividing commercial zoning from residential zoning] must be drawn somewhere," but found that the failure to rezone plaintiffs' property to a commercial classification of some sort is "not 'fairly debatable' but is unconstitutionally discriminatory and confiscatory." *Olive*, 328 So.2d at 856.

On the other hand, "Florida courts have consistently upheld the police power of a municipality to adopt zoning regulations which preserve the residential character of a neighborhood." *S.A. Healy*, 355 So.2d at 814. The court upheld a town's commitment to contain the "headlong plunge toward wall-to-wall concrete" noting that "[u]nbridled growth is not a justification for its own continuance." *Id.* at 814.

The facts in this case most nearly parallel those in *Surfside v. Abelson*, 106 So.2d 108 (Fla. 3rd DCA 1958), *cert. denied*, 111 So.2d 40 (Fla.1959). The plaintiffs in *Abelson* were the owners of property located on the southeast corner of Harding Avenue and 94th Street in downtown Surfside. The property was zoned for multiple [10] family residences under the Surfside master development plan. According to the master plan, two blocks—Harding avenue between 94th Street and 96th Street—were set aside for commercial use while the rest of the town consisted entirely of residential housing except for the hotels along the ocean and Collins Avenue. In 1957, the town constructed a new Town Hall on the southeast corner of Harding Avenue and 93rd Street, which places it one block south of the subject property and outside the two block commercial zone. Locat-

---

10. The property was originally zoned for one family residences, but a prior attempt by plaintiffs to obtain a more liberal zoning classification resulted in a court decree requiring the rezoning of the property for multiple family use. *See Abelson*, 106 So.2d at 109.

ed on the land between the subject property and the Town Hall are four single family residences and a parking lot for a motel which faces on the block to the east. The land immediately across Harding Avenue from plaintiffs' property and bounded by 94th Street on the north and 93rd Street on the south is comprised of five single family residences with three tracts of unimproved land.

The testimony adduced at trial showed that the only material change in the locality since the previous rezoning was the construction of the Town Hall. The court found that the facts presented "[fell] squarely within the 'fairly debatable' rule [11]" and that the construction of the Town Hall did not "so materially change[] the character of the surrounding area so as to make the application of the existing zoning ordinances unreasonable and arbitrary." *Abelson*, 106 So.2d at 110.

In the case at bar, plaintiff argues that the changes in the surrounding area make the denial of his rezoning request arbitrary and unreasonable. In the years since the P.U.D. residential zoning was imposed on the property, Thomasville Road has been expanded from a two-land road to a heavily travelled four-lane arterial with a median strip. Since that time, the "stopping point" for nonresidential developments has shifted southward from Metropolitan Avenue when both the Cureton and Moon properties rezoning requests were granted. Although the property due north of the subject property is

developed residentially, the properties south of the subject property—Oven Park and the Thomasville Road Baptist Church—are not. Because the Oven Park fire station operates 24 hours a day and because the City's Oven Park facility is available for rental, the noise level surrounding plaintiff's property has been increased. The City's renovations to the main house, guest house and grounds of the former Oven home and its renting out the refurbished facilities for private use do constitute "changed circumstances." However, it cannot be said that the new construction and renovations have *materially* changed the nature of the surrounding area to any greater extent that the construction in *Abelson* changed the circumstances in that case.[12] Accordingly, the court does not find that the construction on the Oven Park or surrounding properties "so materially changed the character of the surrounding area so as to make the application of the existing zoning ordinances unreasonable and arbitrary." *Abelson*, 106 So.2d at 110.

2. *The Ad Hoc Application of the Uncodified and Vague Thomasville Road Policy Violates Plaintiff's Substantive Due Process Rights.*

The court does, however, conclude that the City's actions violate plaintiff's substantive due process rights for another reason. Specifically, the court concludes that the *ad hoc* application of the Thomasville Road Policy to deny plaintiff's rezoning requests, but not those of Cureton or Moon,[13]

11. Two important rules of law which sometimes become confused and intertwined are the "substantial relationship rule" and the "fairly debatable rule."

The substantial relationship rule is substantive law, and may be simply stated as follows: In order for a zoning ordinance or regulation to be valid, it must have [some] substantial relationship to the promotion of the public health, safety, morals or general welfare. When correctly applied, this rule is not in any manner modified by the fairly debatable rule. The latter rule, being a rule of procedure or application, may be simply stated as follows: If the application of a zoning classification to a specific parcel of property is reasonably subject to disagreement, that is, if its application is fairly debatable, then the application of the ordinance by the zoning authority should not be disturbed by the courts. Of course, it is always

a matter for the court to determine whether a zoning authority acted reasonably or fairly or whether capriciously or arbitrarily.
*Davis v. Sails*, 318 So.2d 214, 217 (Fla. 1st DCA 1975).

12. In both *Stokes* and *Olive*, the area surrounding the plaintiffs' properties was developed commercially (that is, with fast food restaurants and gas stations), rendering residential development of these plaintiffs' properties unfeasible. This is simply not the case in the case at bar.

13. Because it mistakenly believed it was exempt from its own zoning laws, the City failed to rezone its property to permit the construction of the fire station and the commercial use of the Oven Park rental facility. Had the City gone through the proper rezoning procedures and re-

violates plaintiff's substantive due process rights. Plaintiff argues that the Thomasville Road Policy, which was never formally adopted by the City, is unconstitutionally vague inasmuch as it fails to provide specific standards upon which exemptions to the policy might be granted; these decisions are, therefore, left to the unbridled discretion of the Planning and City Commissions which have been granting them on an *ad hoc* basis.

■ It is a settled principle of law that simply because one tract of land is allowed to be developed at a certain density level does not mean that adjoining properties must be permitted the same use. *Orange County v. Butler Estates Corp.*, 328 So.2d 864 (Fla. 4th DCA 1976). Thus, because one property is rezoned from residential use to office residential use does not mean that an adjoining piece of property must be accorded similar treatment. So long as the zoning authority presents "ample evidence of considerations that affected its decision and make it a fairly debatable one," its decision will be upheld. *Id.* at 866. In this case, however, the *ad hoc* application of the uncodified and unconstitutionally vague Thomasville Road Policy to deny plaintiff's rezoning request violates plaintiff's substantive due process right.

■ An ordinance which lacks sufficient standards against which the zoning authority's actions may be measured vests unreviewable discretion in the zoning authority and is void for vagueness. In *Henry v. Putnam County Board of County Commissioners*, 509 So.2d 1221 (Fla. 5th DCA 1987), the court noted that

> Terms used in an ordinance must make reference to determinable criteria, and provide a context in which a court can determine a particular regulation is reasonable. No legislative body (City Commission) can delegate to an administrator arbitrary discretion to determine the meaning of a zoning code. If such standards or criteria do not exist, the zoning provision is a nullity.

zoned its own property to permit the current uses, the court would also conclude that the *ad hoc* application of the Thomasville Road policy to

*Henry,* 509 So.2d at 1222 (citing *Effie, Inc. v. Ocala,* 438 So.2d 506 (Fla. 5th DCA 1983), *review denied,* 444 So.2d 416 (Fla.1984)). *See also St. Petersburg v. Schweitzer,* 297 So.2d 74 (Fla. 2nd DCA 1974) (holding invalid a zoning ordinance providing that the planning commission may grant special exceptions when no standards by which the commission could be guided were set forth in the ordinance); *Miami v. Save Brickell Ave, Inc.,* 426 So.2d 1100 (Fla. 3rd DCA 1983).

Plaintiff's rezoning request was clearly within the guidelines established by the City's comprehensive plan future land use map. That map designated plaintiff's parcel and other properties fronting Thomasville Road south of I–10 and north of Woodgate Way as "mixed use B," which would include the office-residential use for which plaintiff applied. This comprehensive plan was adopted by city ordinance. Yet, one month after adopting the "codified" future land use map, the city denied plaintiff's rezoning request on the basis of the 1978 uncodified Thomasville Road policy. Specifically, the Planning Commission viewed Everett's request as "being inconsistent with the Commission's adopted policy on land uses in the Thomasville Road/I–10 area, i.e. to not approve any non-residential rezoning requests on Thomasville Road north of Post Road (north of the Sun Bank property)." *See* Findings of Fact at ¶ 40. Yet, the city approved similar requests in 1984 and 1985 by the owners of the Cureton and Moon properties and ignored the policy itself when it constructed the fire station and commercial rental facility at Oven Park. The City claims that it makes exceptions to the Thomasville Road policy "for differing circumstances and conditions" and notes that "other factors [besides the policy] are considered" in its rezoning decisions. However, none of these "circumstances," "conditions" or "factors" are specified either in the uncodified policy or in any legislative enactment. Because no standards are set forth in the Thomasville Road Policy, the City's arbitrary and capricious use of the policy violates plaintiff's substantive due process rights.

enable the City to rezone its own property without granting the same request to plaintiff violated plaintiff's right to substantive due process.

### 3. *City's Alleged Conflict of Interest in Purchasing Oven Park*

 Between the fall of 1988 and autumn, 1989, the city sought to acquire plaintiff's property by purchase, donation or exchange for the expansion of Oven Park. The parties were unable to agree on the price to be paid for the property. During this period, a potential buyer offered plaintiff $555,390.00 for the 1.5 acres of the property fronting Thomasville Road contingent upon approval of a P.U.D. amendment to allow commercial rezoning of the property for use as a bank and professional offices. According to plaintiff, the City's interest in purchasing plaintiff's property conflicted with its role in determining the propriety of plaintiff's rezoning application. Specifically, plaintiff contends that "[t]he City's interest in acquiring Plaintiff's property at minimal cost suggests the presence of an ulterior consideration to deny Plaintiff's proposed P.U.D. amendment which contributes to the arbitrariness of the decision reached." Document 46 at 17. The facts, however, do not support a causal relationship between the City's denial of plaintiff's rezoning request and its desire to purchase plaintiff's property at the lowest cost. Rather, the court deems this to be pure coincidence.

### C. *Conclusion*

For the reasons stated above, the court finds that the City's failure to provide plaintiff notice and an opportunity to object prior to the construction of the fire station and the renovation of the Oven Park property violates plaintiff's procedural due process rights under the United States Constitution. Similarly, the City's arbitrary and capricious refusal to rezone plaintiff's property violate plaintiff's substantive due process rights.

There remain counts of the complaint which have yet to be tried. Furthermore, damages for the City's procedural and substantive due process violations remain to be decided.

Accordingly, it is ORDERED:

1. Judgment shall be entered for plaintiff and against defendant on plaintiff's procedural due process claim.

2. Judgment shall be entered for plaintiff and against defendant on plaintiff's substantive due process claim.

3. Within 15 days of the date this order is docketed, the parties are to confer, and within 5 days thereafter propose to the court a schedule to dispose of the remaining issues, including mediation.

DONE AND ORDERED.

### ORDER AMENDING FINDINGS OF FACT July 2, 1993

Before the court are defendant's Motion for New Trial and to Alter or Amend Judgment and Findings of Fact (document 62), memorandum in support thereof (document 63) and plaintiff's response (document 67). For the following reasons, defendant's motion for new trial is DENIED, its motion to alter or amend judgment is DENIED and its motion to amend findings of fact is GRANTED.

The court hereby vacates paragraphs 42 and 43 in the "Findings of Fact" section of its order dated December 18, 1992, and substitutes the following findings in their place:

[Editor's note: Changes incorporated for publication purposes].

Although the court has slightly modified its findings of fact, the conclusions of law of December 18, 1992 remain the same. This court found that the *ad hoc* application of the uncodified and vague Thomasville Road Policy violated plaintiff's substantive due process rights. The court also found that "one month after adopting the 'codified' future land use map, the city denied plaintiff's rezoning request on the basis of the 1978 uncodified Thomasville Road policy." The court now concludes that although the future land use map was not "codified into law" until July, 1990, it is still relevant, representing the City's intent to designate plaintiff's property as "mixed use B." Although the City *might* have chosen to amend its plan at any time before or after the Department approved it, there is no evidence that the City did so. Plaintiff's proposed amendment was consistent with the future land use map enacted by the City in February, 1990 and approved by the State in July, 1990. The

**1548**

City, however, as more fully explained in this court's December 18, 1992 order, decided to apply, on an *ad hoc* basis, the uncodified and unconstitutionally vague Thomasville Road Policy to deny plaintiff's rezoning request. This action violated plaintiff's substantive due process rights.

Accordingly, it is ORDERED:

1. Defendant's Motion for New Trial and to Alter or Amend Judgment and Findings of Fact (document 62) is GRANTED IN PART AND DENIED IN PART as follows:

a. Defendant's motion for new trial is DENIED.

b. Defendant's motion to alter or amend judgment is DENIED.

c. Defendant's motion to amend findings of fact is GRANTED as explained above.

2. Plaintiff's Renewed Motion for Status Conference and Scheduling of Remaining Proceedings for Final Hearing (document 76) is GRANTED. The Clerk of the Court shall set this case for a status conference as soon as possible.

DONE AND ORDERED.